**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---

Michel Sharritt; Melody Cannon; Maurice Cross; Christopher Meyer, Dareios Little and Karl Lee, individually and on behalf of themselves and all others similarly situated,

           Plaintiffs,

v.

Gwen Henry in her capacity as Treasurer of DuPage County, Illinois, Jean Kaczmarek in her capacity as Clerk of DuPage County, Illinois, DuPage County, Illinois, Susan J. Goral in her capacity as Treasurer of Winnebago County, Illinois, Lori Gummow in her capacity as Clerk of Winnebago County, Illinois, Winnebago County, Illinois; Nicole Bjerke, in her capacity as Treasurer of Peoria County, Illinois, Rachael Parker in her capacity as Clerk of Peoria County, Illinois, Peoria County, Illinois, Holly Kim, in her capacity as Treasurer of Lake County, Illinois, Anthony Vega in his capacity as Clerk of Lake County, Illinois, Lake County, Illinois; Tim Brophy, in his capacity as Treasurer of Will County, Illinois, Andrea Linn in her capacity as clerk of Will County, Illinois, Will County, Illinois, Chris Lauzen, in his capacity as Treasurer of Kane County, Illinois, John Cunningham in his capacity as Clerk of Kane county, Illinois, Kane County, Illinois; Lydia Hutchcraft, in her capacity as Treasurer of Carroll County, Illinois, Amy Buss, in her capacity as clerk of Carroll County, Illinois, Carroll County, Illinois; Curt Newport, in his capacity as Treasurer of Boone County, Illinois, Julie Bliss in her capacity as Clerk of Boone County, Illinois, and Boone County, Illinois,

           Defendants.

---

Case No.: 1:23-cv-15838

FIRST AMENDED CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

**INTRODUCTION**

1.      Under the Defendants' property tax systems, which are governed by and uniformly implement the Illinois Property Tax Code, 35 ILCS 200/1-1 *et seq.*, Illinois homeowners who fail to pay property taxes ultimately can be and are divested without compensation not just of title to their home, but of the monetary value of their home over and above the amount owed in taxes, penalties, interest and costs (collectively "Tax Amounts").

2.      When homeowners in the Defendant counties fall behind in payment of property taxes, a tax lien is placed on the property for the amount of delinquent Tax Amounts. The Tax Amounts are then sold to speculators, often referred to as "Tax Buyers." Along with the right to collect the back taxes plus continuing interest charges, the Tax Buyers also obtain the county's claimed rights to a tax lien on the property, and if the Tax Amounts are not timely "redeemed" or paid off within a certain time, the Defendants grant to the Tax Buyers the right to foreclose, obtain a tax deed to the property, and obtain an order from the court to evict the owner and other family members and occupants and remove their possessions to the public right of way. The taxpayer receives no compensation for the home or the equity in it in excess of the Tax Amounts.

3.      Defendants' actions, including selling the right to obtain homeowners' equity and seizing or causing the seizure of homes with value in excess of the Tax Amounts without the immediate and certain payment of just compensation, violates the Fifth Amendment to the U.S. Constitution. *Tyler v. Hennepin County*, 598 U.S. 631, 143 S.Ct. 1369 (2023). Defendants may not constitutionally deprive taxpayers of property or value, *i.e.*, home equity, in excess of the Tax Amounts owed without paying just compensation. *Id.* The value of the home in excess of the Tax Amounts ("Surplus Value") belongs to the taxpayer and the government has no claim on it. *Id.* It is black-letter law that taxpayers are not required and cannot be compelled to relinquish more than

they owe in taxes: "The taxpayer must render unto Caesar what is Caesar's, but no more." *Id.*, at 1380.[1] Defendants cannot avoid liability for their actions by claiming they merely conveyed to private parties, *i.e.*, Tax Buyers, the right to foreclose and obtain a tax deed without paying compensation. Defendants had no right to sell to Tax Buyers a right to obtain the Plaintiffs' and putative Class Members' property (*i.e.*, the former owner's Surplus Value) unless "just compensation" therefor was to be provided on issuance of a tax deed. U.S. Const., amend. V. Nor is Defendants' system materially different from the system at issue in *Tyler:* in Illinois as in Minnesota, where *Tyler* arose, failure to pay taxes results in government action leading to the uncompensated seizure and deprivation of the owner's equity or Surplus Value. The economic effect and loss to the homeowner is the same.

4.     Plaintiffs bring this action on behalf of themselves and a Class defined below of similarly situated former property owners against the Defendant Counties, Treasurers and Clerks, which are all juridically linked, for compensatory relief pursuant to, in the alternative, the Illinois Constitution, 42 U.S.C. § 1983 and the self-effectuating Fifth Amendment to the United States Constitution *directly*. Jurisdiction exists under 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 3613.[2]

---

[1] Defendants' conduct also violates the Eighth Amendment to the U.S. Constitution. *See Tyler*, 143 S.Ct. at 1381-82 (Gorsuch, J., concurring) and the similar provisions of the Illinois constitution.

[2] Plaintiffs do not seek, directly or indirectly, to enjoin, suspend or restrain the assessment, levy or collection of any tax or Tax Amounts due or owed pursuant to Illinois state or local law or otherwise. Rather, this action challenges only the deprivation of their equity they and the putative class members have built up in their homes *in excess* of such Tax Amounts.

## PARTIES

### Plaintiff Michel Sharritt

5.     Plaintiff Michel Sharritt is a natural person and resident citizen of DuPage County, Illinois.

6.     She was an owner of residential property – her home – in Naperville, Illinois. Ms. Sharritt's property at all times relevant hereto had a fair market value substantially in excess of any Tax Amounts due.[3]

7.     DuPage County sold not only the right to collect the Tax Amounts on Ms. Sharritt's property, but also the right to foreclose upon her Surplus Value.

8.     Plaintiff did not redeem, and the redemption period expired.

9.     A deed for the property was issued to a Tax Buyer. When the tax deed was issued, DuPage County effectively took for itself and then conveyed to the Tax Buyer the Surplus Value in Ms. Sharritt's home without paying just compensation for her home.

10.     The first time that authorities came to evict Ms. Sharritt and her family, including her husband, two small children and the family dog, there were five (5) Sheriff vehicles parked outside her house, in addition to the Tax Buyer and movers.

11.     The Tax Buyer introduced himself to Plaintiff's neighbors, stating how difficult this eviction procedure had been for him.

12.     Plaintiff told her husband to get the dog and the kids, go out the basement garage door, put them in the car, and go to his mother's house.

13.     Plaintiff gave the Sheriff deputies the garage code and they let themselves in and

---

[3] Addresses of Plaintiffs' homes are omitted for confidentiality and security reasons; Defendants have the addresses in their records.

started to move household items into the garage because it was pouring rain.

14. Once the authorities were in the house, Plaintiff called her attorney, who was able to temporarily stop the eviction.

15. Approximately one month later, however, the day before her birthday, Plaintiff received notice the family would be evicted on her birthday.

16. Plaintiff's neighbors and family helped remove the family's possessions, and Plaintiff and her family were evicted from their home again, this time for good.

**Plaintiff Karl Lee**

17. Plaintiff Karl Lee is a natural person and resident citizen of Peoria County, Illinois.

18. He owned residential property which he lived in as his home in Chilicothe, Illinois.

19. The Lee property at all times relevant hereto had a fair market value substantially in excess of any Tax Amounts due.

20. Peoria County sold not only the right to collect the Tax Amounts on the Lee property, but also the right to foreclose upon Mr. Lee's Surplus Value.

21. Plaintiff did not redeem and the redemption period expired.

22. A deed for the property was issued to the Tax Buyer. When the tax deed was issued, Peoria County effectively took for itself and then conveyed to the Tax Buyer the Surplus Value in Mr. Lee's home without paying just compensation for his home.

23. Plaintiff Lee is a U.S. military veteran, having served two years on active duty and nine years in the Army Ready Reserve; he was honorably discharged.

24. When he purchased the home it was in poor condition and Mr. Lee, who is self-employed as a contractor, gradually fixed it up over time, building both "sweat equity" and monetary Surplus Value in his home. He had owned and lived in the home for some twelve years

when he was evicted on five (5) days' notice.

**Plaintiffs Melody Cannon and Maurice Cross**

25.     Plaintiffs Melody Cannon and Maurice Cross are resident citizens of Carroll County, Illinois.

26.     They owned residential property in Shannon, Illinois, which they lived in as their home.

27.      The property at all times relevant hereto had a fair market value substantially in excess of any Tax Amounts due.

28.     Carroll County sold not only the right to collect the Tax Amounts on the Cannon/Cross property, but also the right to foreclose upon their Surplus Value.

29.     Plaintiffs did not redeem and the redemption period expired.

30.     A tax deed for the property was issued to the Tax Buyer. When the tax deed was issued, Carroll County effectively took for itself and then conveyed to the Tax Buyer the Surplus Value in the Cross/Cannon home without paying just compensation for their home.

31.     After the tax deed issued, Plaintiffs returned to their home to find someone attempting to force entry with a crowbar even though there were police cars parked in front of the house.

32.     Plaintiffs assumed at first the officers were there to arrest the person trying to break into their house. But, that proved not to be the case. The officers were there to take possession of the house and told Plaintiffs if they didn't leave, ***they*** would be criminally trespassing.

33.     The man with the crowbar said he had served them with papers, but Plaintiffs had not received any.

34.     After being evicted, Plaintiffs moved to a motel along with Ms. Cannon's four-year

old grandson, who Plaintiffs had been (and still are) caring for.

35.     Following Plaintiffs' move to the motel, someone – presumably one or more representatives of the Tax Buyer – appeared at their home and removed Plaintiffs' possessions. A neighbor made a video recording.

36.     Among the items removed were a boat and trailer belonging to the Plaintiffs' preacher which were being stored at Plaintiffs' house, a set of mechanic's tools, and an automobile belonging to Plaintiff Cannon's daughter.

37.     Plaintiff Cannon had been attempting to negotiate with the Tax Buyer to repurchase the home, but the Tax Buyer ultimately refused to cooperate, no repurchase occurred, and Plaintiffs' and others' possessions have not been recovered.

**Plaintiff Christopher Meyer**

38.     Plaintiff Christopher Meyer is a resident citizen of Boone County, Illinois.

39.     He owned residential property in Belvidere, Illinois, which he lived in as his home.

40.     The property, at all times relevant hereto, had a fair market value substantially in excess of any Tax Amounts due.

41.     Boone County sold not only the right to collect the Tax Amounts on Mr. Meyer's property, but also the right to foreclose upon Mr. Meyer's Surplus Value.

42.     Plaintiff did not redeem and the redemption period expired.

43.     A deed for the property was issued to the Tax Buyer. When the tax deed was issued, Boone County effectively took for itself and then conveyed to the Tax Buyer the Surplus Value in Mr. Meyer's home without paying just compensation for his home.

44.     When he was evicted, Mr. Meyer was a student. He did not have time to pack everything and some possessions were left by those evicting him in garbage bags near the street.

7

Some possessions were broken and others were stolen or removed by persons unknown.

45. Following his eviction, Mr. Meyer went to a hotel and then was admitted to the hospital. After he was discharged, he went to another hotel.

46. Mr. Meyer has been on disability and is currently at a rehabilitation facility.

**Plaintiff Dareios Little**

47. Plaintiff Dareios Little is a resident citizen of Michigan.

48. He owned residential property in DuPage County, Illinois, which he lived in.

49. The property, at all times relevant hereto, had a fair market value substantially in excess of any Tax Amounts due.

50. DuPage County sold not only the right to collect the Tax Amounts on the Mr. Little's property, but also the right to foreclose upon Mr. Little's Surplus Value.

51. Plaintiff did not redeem and the redemption period expired.

52. A deed for the property was issued to the Tax Buyer. When the tax deed was issued, DuPage County took for itself and then conveyed to the Tax Buyer the Surplus Value in Mr. Little's home without paying just compensation for his home.

53. In anticipation of being evicted, Mr. Little had been trying to find space in a nearby shelter for himself, his wife, and seven children but was told his family was too big and that he should look into shelters in Chicago.

54. On the day of eviction, the DuPage County Sheriff arrived at approximately 7:00 a.m. Mr. Little was in process of moving the family's possessions into a storage unit because there was nowhere else to put them. The family thereupon moved into a motel – which Mr. Little had to borrow money to pay for – where they stayed for about two weeks, later moving to Kalamazoo, Michigan, where they found affordable housing and now reside. Mr. Little is currently unemployed

and looking for work.

55.     Plaintiffs were all deprived of their Surplus Value by the Defendants, *i.e.*, their homes and the equity in them were taken, for a public use or purpose, and they received no compensation, "just" or otherwise, for the equity in their home in excess of the Tax Amounts owed; *i.e.*, their Surplus Value.

56.     As a direct, proximate and foreseeable result of Defendants' unlawful and unconstitutional taking and conveyance of the Plaintiffs' Surplus Value without paying just compensation for such Surplus Value, Plaintiffs were injured in fact; they lost all rights in their properties and all value in excess of the Tax Amounts owed, including the right to use, live in and dispose of them, thus suffering a "classic pocketbook injury." See *Lujan v. Defenders of Wildlife,* 504 U. S. 555, 560–561 (1992), cited with approval in *Tyler, supra.*

### Defendants

57.     Defendants Gwen Henry and Jean Kaczmarek are sued in their official capacities. They are and have been the duly elected and acting Treasurer and Clerk of DuPage County, Illinois. Acting with the discretion vested in them in those positions they supervise and administer DuPage County's tax sales and forfeitures at issue herein. In this official capacity, Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

58.     Defendant DuPage County, Illinois, is a political entity and includes its agents, who include Defendants Henry and Kaczmarek. DuPage County is a party defendant, including *but not limited to* for purposes of indemnification of Defendants Henry and Kaczmarek as to any monetary amounts recovered by Plaintiffs through this action. *See Carver v. Sheriff of LaSalle County*, 203 Ill.2d 497 (2003), and *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003).

59.     Plaintiffs repeat and reallege the allegations of the immediately preceding two

paragraphs, substituting for Defendants Henry and Kaczmarek and DuPage County:

Defendants Kim and Vega and Lake County;

Brophy and Linn and Will County;

Bjerke and Parker and Peoria County;

Hutchcraft and Buss and Carroll County;

Newport and Bliss and Boone County;

Lauzen and Cunningham and Kane County; and

Goral and Gummow and Winnebago County.

60.     Defendants, acting under color of state law and through their policies and customs, and acting in uniform fashion pursuant to Illinois statutes, *e.g.,* 35 ILCS 200/21- 1, *et seq.,* violated Plaintiffs' and the putative Class's rights by, among other things, seizing and conveying equity in their homes in excess of the Tax Amounts due, without reasonable, certain and adequate just compensation as required by the Fifth Amendment as interpreted by *Tyler, supra*, and *Cherokee Nation v. Southern Kansas Railway Co.*, 135 U.S. 641, 659 (1890).

61.     The Defendant Counties and their respective Defendant Treasurers and Clerks are juridically linked within the meaning of *Payton v. County of Kane,* 308 F.3d 673, 678–80 (7th Cir. 2002).

62.     Each Defendant County, its Treasurer and its Clerk act by and for one another and together as joint actors in the name of and on behalf of the respective County Defendants. Each acts both for itself and as agent and representative and co-venturer of and with the others.

## FACTUAL ALLEGATIONS

63.     Under ILLINOIS'S PROPERTY TAX CODE, counties, including Defendants, sell delinquent property taxes to third-party investors or speculators – Tax Buyers – who pay the

delinquent taxes and in return receive the right to collect the back taxes, and all Tax Amounts, from the homeowner, plus interest, and who further are granted by the Defendants the right to foreclose upon and take all value in such homeowner's residence, including the homeowner's Surplus Value in their homes. 35 ILCS 200/21-215; 21-240.

64.     Upon paying a county for the Tax Amounts, the county grants to the Tax Buyer a tax lien on the homeowner's property. If the homeowner does not timely reimburse the Tax Buyer for such Tax Amounts, the Tax Buyer may foreclose, take ownership of the home, sell or otherwise use the home, and retain all value of the home as a windfall, even if the value of the home exceeds the Tax Amounts.

65.     Once a homeowner's taxes are sold, the Tax Buyer gets the right to collect high rates of penalty interest on the back taxes – historically, up to 18% every six months, or 36% per year –although the General Assembly capped the penalty interest rates at a still-high rate of 9% per six months, or 18% per year, beginning in 2022. See Housing Action IL Report, *infra.*, at n.4; 35 ILCS 200/21-215. Partly as a result of these high interest rates, property owners face unreasonable and sometimes insurmountable obstacles when trying to meet the redemption deadline. A 2019 WBEZ analysis found that property owners who were able to redeem after their properties were sold at the tax sale paid nearly three times what tax buyers had paid for the property owners' unpaid taxes, on average. Odette Yousef, "Cook County Makes Millions By Selling Property Tax Debt — But At What Cost?," WBEZ Chicago (May 3, 2019), https://www.npr.org/local/309             /2019/05/03/719971654/cook-county-makes-millions-by-sellingproperty-tax-debt-but-at-what-cost (last visited March 5, 2024).

66.     Most properties seized do not have mortgages on them because if there is a mortgage on the property, an interested third-party (*e.g.*, the mortgage lender) will typically pay

delinquent property taxes to protect the property from seizure or sale. Also, when there is a mortgage, the taxes typically are paid along with the mortgage into a tax escrow account and then paid by the lender and thus are less likely to be overlooked by the owner. In addition, any delinquency comes to the immediate attention of the lender, if there is one, who can alert the owner. Properties most affected by the tax sale are thus those in which the owners have often built significant equity.

67.     One recent report suggests forfeiting homeowners often lose more than $135,000 in equity. *See* Sidnee King, Tax Sale Process Hits Black Homeowners Hardest, Illinois Answers Project (Nov. 17, 2022), https://illinoisanswers.org/2022/11/17/tax-sale-process-hits-black-homeowners-hardest/ (last visited March 5, 2024) ("the average home equity lost after eviction [for non-payment of taxes] was at least $135,000, while the median cost for tax purchasers to get a lien on their properties was just over $2,000.").

68.     Most residential property owners have thirty (30) months from the date of the tax sale to redeem their property by paying off the Tax Amounts. 35 ILCS 200/21-350(b).

69.     If a Tax Buyer takes title, and becomes the legal owner, it may and often does, with the aid of the county Sheriff, evict the former owner, the owner's family and any other residents. 35 ILCS 200/22-40.

70.     In 1976, an Illinois Legislative-Investigative Commission found Illinois' practice of "total forfeiture" as described herein to be needlessly harsh and recommended replacing it with a "sale-surplus system" that would not penalize owners so heavily:

> The Commission's main conclusion was that there is no relation between the threat of total forfeiture and the rate of tax collection, and we recommend that this severe penalty be stricken from the statutes. We recommend that the current tax deed sale be eliminated and replaced by a sale-surplus system, whereby delinquent property is sold at a public auction. The proceeds of the sale would be first

> applied to the costs of the proceedings and the fees incurred; the tax buyer would collect the monies due him, and the surplus would be turned over to the original owner.
>
> Under this system, a property owner who fails to redeem is penalized sufficiently; the State receives its taxes; and the tax buyer realizes a profit. Our recommendations simply eliminate the possibility of a tax buyer reaping an unearned windfall at the expense of those who can least afford it.

Illinois-Legislative Investigating Commission, Annual Report of 1976: Delinquent Tax Sales: A Report to the Illinois General Assembly 24 (1976). *See* https://www.ojp.gov/pdffiles1/Digitization/39864NCJRS.pdf (visited 03/10/24). Similar systems are in place and in response to *Tyler* being put in place in other states.

71. Despite these findings and recommendations, the non-adoption or abandonment of the total forfeiture system by the vast majority of taxing authorities in other states, and now the Supreme Court's unanimous ruling in *Tyler*, Defendants have never implemented reforms and persist in their unjust, unconstitutional practices.

72. The harshness of Defendants' system is exacerbated by the fact that homeowners who lose their homes often are elderly and infirm and by the fact that delinquent property taxes are usually small in relation to the value of the home. "When a tax deed is issued, the investor typically acquires the property at a fraction of the value, creating very large profits for the investor and a huge loss of equity for the property owner."[4]

73. Homeowners fail to redeem their properties for a variety of reasons including

---

[4]Housing Action Illinois, *Racial Disparities and Cook County Tax Sale Evictions* (hereafter "Housing Action IL Report") at 5 (Nov. 2021), https://housingactionil.org/downloads/Policy/Racial-Disparities-and-Cook-County-Tax-Sale-Evictions.pdf (visited 03/10/24); Michael Sallah, Debra Cenziper, Steven Rich, "Left With Nothing," Wash. Post (Sept. 8, 2013), https://www.washingtonpost.com/sf/investigative/2013/09/08/left-with-nothing/ (visited 03/10/24) (of close to 200 Washington, D.C. residents who lost their properties, one in three had liens worth less than $1,000).

insufficient notice, lack of funds, mental illness, dementia, physical handicaps, hospitalization, and confusion about the redemption process. *See Apex Tax Invs., Inc. v. Lowe (In re Cty. Collector)*, 225 Ill. 2d 208, 217 (2007) (property owner hospitalized with mental illness); *Giordano v. Trzaska*, 2014 IL App. (2d) 130778-U, ¶ 8 (lack of notice and confusion about instructions from Treasurer's office in Boone County); *see also* Andrew W. Kahrl, *Investing in Distress: Tax Delinquency and Predatory Tax Buying in Urban America*, 43(2) Critical Socio. 199 (2017) ("Investing in Distress") (citing reporting from Washington, D.C. that most residents who lost homes "were black, elderly, sick or suffering some form of mental illness").

74.     Homeowners also may fail to redeem their properties due to inadequate funds and inability to secure a loan against the equity in their home. *See* Friedman, R.A. (Apr. 29, 2021) Why Home Equity Loans Are Still So Hard to Come By, *Wall Street Journal*, www.wsj.com/articles/why-home-equity-loans-are-still-so-hard-to-come-by-11619699464 (visited March 8, 2024). Lenders typically do not loan money to persons in default on taxes, make mortgage or home equity loans for homeowners to use to pay back taxes or lend on home equity alone. Key loan eligibility determinants also include income, credit history or score, liquid assets such as bank deposits, payment history and other factors.

75.     In instances involving a foreclosure by a lender, excess sale proceeds beyond those needed to pay off the mortgage loan are required by statute to be returned to the borrower-owner. Homeowners are thus better off having their homes foreclosed by a lender than seized by the government for taxes.

76.     The shocking result of Defendants' unnecessary system is that if a homeowner is unable to pay real estate taxes, resulting for example in $10,000 in tax-related debt on a property worth $258,000 (the median value of a home in Illinois), the Tax Buyer would get the title to the

home while the owner receives nothing—losing $248,000 in equity, an amount which may represent the owner's life savings. *See* https://www.redfin.com/state/Illinois/housing-market (visited 03/08/24).

77.     Defendants know and intend that Tax Buyers will seek and receive tax deeds divesting the owner of ownership and that no compensation will be paid to the former owner when that happens.

78.     By delegating to Tax Buyers the unseemly foreclosing and evicting of unfortunate homeowners, Defendants avoid opprobrium that would otherwise be visited on them and the expense they would otherwise have to bear in foreclosing and evicting owners and either re-selling or repurposing the property.

79.     Defendants derive additional financial benefits from transferring equity, including Surplus Value, from owners to Tax Buyers; doing so attracts windfall-equity seeking Tax Buyers to the Defendants' tax sales, making tax collection easier, less expensive and more certain.

80.     Defendants receive consideration for supplying Tax Buyers with the ability to foreclose, obtain equity and evict owners; were this not so it would violate the "Gift Clause" of the Illinois Constitution, Art. VIII, Sec. 1.

81.     Uncompensated owners whose homes are seized as a result of Defendants' actions subsidize Defendants' costs of tax collection in a disproportionate and unfair manner, as prohibited by *Armstrong v. United States,* 364 U.S. 40 (1960), with the result that public costs are improperly shifted onto a small number of people who can ill afford them: the unfortunate former owners whose homes are seized.

82.     It is not relevant that Defendants may have accomplices or assistants in their wrongdoing or that Tax Buyers, rather than the government, receive the direct proceeds of the

equity forfeitures visited on homeowners. The owner's loss, not the taker's gain, is the measure of just compensation. *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 236 (2003); *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 281 (1943); *United States v. Miller*, 317 U.S. 369, 375 (1943).

83.     The Supreme Court has recognized that government-caused "transfer[s of] property from one private party to another" to further a public purpose, such as transfers of property from Plaintiff property owners to Tax Buyers, are takings governed by the Fifth Amendment. *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). It is a loss to the citizen, *i.e.*, "deprivation", rather than a gain to the government, that constitutes a taking. In a takings case, "the question is what has the owner lost, not what has the taker gained." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999) (internal quote omitted).

84.     The Attorney General of Colorado recently opined that while Colorado is a tax buyer state like Illinois, *Tyler* nonetheless applies equally to its tax system. *See* https://coag.gov/app/uploads/2023/07/AG-Formal-Opinion-No-23-01.pdf ("whether the county receives the sale proceeds is irrelevant to the *Tyler* analysis. What matters is whether the property owner is deprived of property with a value exceeding the tax debt owed"; "the logic of *Tyler* (and of takings jurisprudence in general) does not warrant a different outcome where the county gives property away versus selling it.").

85.     The New Jersey Court of Appeals – New Jersey is another a tax buyer state – recently reached the same conclusion in the context of property tax forfeitures. "[T]he application of *Tyler* to New Jersey's similar TSL framework establishes that the confiscation of a New Jersey property owner's equity, through a tax sale foreclosure, violates the Fifth Amendment Takings Clause". *257-261 20th Avenue Realty, LLC v. Roberto*, 477 N.J. Super. 339, 350, 307 A.3d 19, 25 (App. Div. 2023). Further, "[t]he government cannot confer to a third-party a greater entitlement

to property than that to which the public entity is entitled… it is clear a third-party tax sale certificate holder's taking of property without just compensation, through a tax sale foreclosure, is not shielded from the application of the holding in *Tyler* as a violation of the Fifth Amendment Takings Clause.") *Id.,* at 365, 307 A.3d at 34.

86.     There is a direct causal link between each Defendant's policy or custom of taking property for a public purpose by issuing tax deeds without paying for them and the resulting constitutional deprivation(s) and violations complained of.

87.     Defendants know to a substantial certainty that uncompensated takings (as well as excessive fines and due process violations) will occur by reason of their actions.  Indeed, they cannot lawfully *convey* a right to Surplus Value without first having "taken" it for themselves. *Id.*

88.     It is Defendants' official policy and custom to promote Tax Buyers' obtaining tax deeds on properties whose taxes have been sold without providing any compensation to the owners.

89.     Defendants have made a decision to engage in this practice of taking and paying no compensation and to violate citizens' constitutional rights.  Indeed, they have adopted this policy and practice despite the fact that the vast majority of states ***do*** compensate homeowners when their properties are taken to satisfy property tax obligations. *See, e.g., Tyler v. Hennepin Cnty*., 143 S. Ct. 1369, 1372 (2023).

90.     Defendants, including Defendant Treasurers and Clerks, have final policymaking authority.

91.     Nothing requires or compels any Defendant to refrain from paying just compensation to Plaintiffs and members of the Class.

92.     Defendants all play a substantial and necessary role in the challenged takings

without compensation. The Defendant Treasurers are primarily responsible for conducting the tax sale itself and the Defendant Clerks have a critical role as they "make out and deliver to the purchaser of any property sold under Section 21-205, a certificate of purchase countersigned by the collector, describing the property sold, the date of sale, the amount of taxes, special assessments, interest and cost for which they were sold and that payment of the sale price has been made." Sec. 21-250. The Defendant Clerks are also responsible for keeping the books and records that serve as "prima facie evidence to prove the sale of any property for taxes," a necessary condition for the Clerk's issuance of the tax deed divesting homeowners of their property and conveying the homeowners' Surplus Value to Tax Buyers. 35 ILCS 200/21-255, 35 ILCS 200/22-65.

93.     Defendants are the moving force behind the complained of loss of equity and failure to provide just compensation and the existence of accomplices, co-actors or helpers such as Tax Buyers does not change that.

94.     Defendants have decided not to pay just compensation, as evidenced, *inter alia*, by the fact no compensation, "just" or otherwise, is paid by them. Defendants have decided to sell the right to foreclose and issue the tax deeds; tax sales do not occur spontaneously and tax deeds do not issue themselves. These actions directly lead to the uncompensated takings.

95.     Tax Buyers and courts do not conduct tax sales, issue tax certificates, maintain records relating to redemptions, or issue tax deeds. The only ones who take these actions are Defendants. Without Defendants' actions, no owner would be deprived of property without just compensation. It is irrelevant that others may also be involved in the uncompensated takings; under ordinary principles of causation, Defendants like any other wrongdoer or tortfeasor are liable for deprivations and harm they cause.

96.     Defendants have a policy, practice and uniform custom of issuing tax deeds and not paying compensation for lost equity.

97.     Supposedly to alleviate some of the undue suffering occasioned by loss of a home for failure to pay small amounts of taxes (but notably **_not_** to pay just compensation because when the statute was enacted it was erroneously believed home equity was not "property" and that confiscating a home for failure to pay taxes was not a taking), Illinois created what is called the Indemnity Fund, 35 ILCS 200/21-305. It creates an optional cause of action allowing a select subset of homeowners who suffer loss due to issuance of a tax deed to file a lawsuit, prove their own lack of fault for the nonpayment of their taxes, and seek a limited monetary award from a limited fund maintained by the county. However, the Indemnity Fund has been the proverbial "drop in the bucket" in terms of alleviating suffering by homeowners and a complete failure in terms of actually providing just compensation to homeowners. This latter is hardly surprising in that providing just compensation is not and never was the Indemnity Fund's purpose. As evidenced by the fact that it is called the "Indemnity Fund", not the "just Compensation Fund," the Indemnity Fund is not even authorized to pay just compensation, only the undefined term "indemnity", and, as many reported decisions establish, one can experience a taking and still lose an Indemnity Fund lawsuit on a variety of grounds. The problems with the Indemnity Fund are compounded by its complicated, confusing and ill-defined patchwork of eligibility limitations and its equally complicated and arbitrary set of proof requirements and recovery limitations, with the predictable result that few if any equity theft victims recover anything and not a single one has ever recovered an amount equal to full just compensation as required by the Constitutions.

98.     Courts are not empowered under the Indemnity Fund statute to award full just compensation, and do not do so. They can only award indemnity, which, while not defined in the

statute, is not required to be equal to or greater than, and indeed, being limited at its upper end to the fair cash value of the property less any mortgages or liens, is never even theoretically sufficient to equal just compensation for the owner's property loss.

99.    In fact, under the collateral source rule, awards of indemnity are not even a legally permitted offset against a just compensation entitlement. The collateral nature of Indemnity Fund awards is attested to by the fact that the Indemnity Fund statute does not even allow a suit against the parties who are guilty of the uncompensated taking, *i.e.*, Defendants, but requires that suit be brought against the Treasurer in his/her capacity as Trustee of the Indemnity Fund.

100.    Even assuming the Indemnity Fund paid amounts *could* be credited against the Defendants' obligation to pay just compensation, full just compensation is not and cannot be awarded or paid under the Indemnity Fund statute. For example, no compensation for delay or prejudgment interest is awarded or is permitted to be awarded from the Indemnity Fund even though such compensation is a mandatory component of "just compensation." *See, e.g., Albrecht v. United States*, 329 U.S. 599, 602 (1947) (When payment of compensation is deferred for a period following the taking, "something more than fair market value is required to make the property owner whole, to afford him 'just compensation.' " and "[t]his additional element of compensation has been measured in terms of reasonable interest."); *Jacobs v. United States*, 290 U.S. 13, 17 (1933).

101.    The Indemnity Fund is not operated with the goal of providing full just compensation to all persons who have suffered an uncompensated loss of property by reason of the issuance of a tax deed and does not do so.

102.    The existence of an opportunity to retain an attorney and file a lawsuit for indemnity (Indemnity Fund petitions are routinely resisted) is not the equivalent to paying them

just compensation, any more than permitting a homeowner to sue for unjust enrichment or indeed permitting them to sue for just compensation would be. In other words, it is illogical for persons or entities in the position of Defendants to assert that they are not liable to pay just compensation for a taking because Plaintiffs have the ability to sue *someone else* – the Trustee -- for *something else, i.e.*, indemnity. Just compensation is not provided by allowing a takings victim to bring an Indemnity Fund lawsuit that is more difficult, complicated and limiting than a straight takings claim; it is provided by paying just compensation, something Defendants do not do and stubbornly refuse to do in direct violation of the Constitution, as made abundantly clear by the Supreme Court's ruling in *Tyler*.

103.    The problems of the Indemnity Fund are underscored by noting that the Indemnity Fund is effectively hidden from public view and not widely known. Moreover, the Indemnity Fund requires a formal court filing, retention of and payment to an attorney, and ultimately a trial, and in practice fails to provide homeowners with timely, meaningful, certain or legally sufficient compensatory or other relief, as even destitute and blameless homeowners can be denied compensation.

104.    Further compounding these problems, the Indemnity Funds are not adequately or sufficiently funded, and even successful homeowner petitioners often must wait to be paid. It is no wonder that a *de minimis* number of homeowners file Indemnity Fund lawsuits and even fewer receive indemnity in any amount, let alone an amount close to the value of the homeowner's lost equity.

105.    Importantly, and as noted, the Indemnity Fund statute provides that a homeowner's fault or negligence is a defense to payment. Defendants exploit this defense in resisting and seeking to oppose and deny recovery of indemnity. But lack of fault or negligence is not a defense to paying

just compensation for the taking of private property for a public use.

106.    The Indemnity Fund arbitrarily and without basis discriminates among homeowners seeking indemnity on the basis of the type and size of their property and on the basis of how much indemnity is sought, *see, e.g.,* 35 ILCS 200/21-305(a)(1), neither of which would be a legitimate basis to discriminate under the takings clause.

107.    Indemnity Fund awards are arbitrarily reduced for impermissible reasons such as the existence of a lien, even an invalid, discharged or unenforceable lien. 35 ILCS 200/21-305(a)(4).

108.    The Indemnity Fund does not provide or function as a reasonable, certain, and adequate means of providing just compensation to homeowners divested of their property.

109.    There is no mechanism under Illinois law to *prevent* the Defendants from taking property without paying compensation. The owner's only possible means of redress is to file a suit *after* that happens. But the government violates the takings clause *when* it takes property without compensation. A property owner acquires a right to compensation immediately upon a taking and may bring a takings lawsuit *at that time,* and may prosecute the lawsuit unless and until he receives just compensation.

110.    Even if the Indemnity Fund were a remedy for a taking, which it is not, a property owner is not required to wait for or utilize or exhaust any state court remedy before bringing a takings lawsuit, and a takings lawsuit may not be dismissed on the grounds that an alternate remedy may exist.

111.    The existence of a post-taking state court remedy such as the Indemnity Fund, especially a remedy so deficient and uncertain, is irrelevant to this lawsuit.  "[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for

public use without paying for it. The Clause provides: '[N]or shall private property be taken for public use, without just compensation.' It does not say: 'Nor shall private property be taken for public use, without an available procedure that will result in compensation.'"). *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2170, 204 L. Ed. 2d 558 (2019).

112. Defendants fail to provide affected homeowners with any notice about homeowners' rights or the fund including on websites that Defendants maintain. Defendants fail to provide proper support for affected homeowners to apply for funds. Rather than administering a program that automatically provides the just compensation to which affected homeowners are entitled as required under the U.S. Constitution, Defendants' position is dismissive. They essentially say, "If you don't like it, go hire a lawyer and sue us."

113. And then, even if homeowners learn about the Indemnity Fund, and can afford to hire an attorney (an unlikely event since many affected homeowners are low income and/or disadvantaged) to file a lawsuit to petition for indemnity, the Fund provides relief only to a small number of homeowners each year, in an amount less than they are actually owed as just compensation for their lost equity value, and only after substantial expense, effort, and often ***years*** of delay.

114. Compounding these problems, the Indemnity Fund is not adequately or sufficiently funded – if more than a fraction of eligible homeowners brought and succeeded in Indemnity Fund claims the Fund would be exhausted – and even the few successful homeowner petitioners must wait to be paid. The Illinois Supreme Court has ruled that lack of funds is a valid basis to deny indemnity. *Malmloff v. Kerr*, 227 Ill. 2d 118, 127-128, 879 N.E.2d 870 (2007). However, "lack of funds" is not a proper basis to deny the constitutional obligation to pay just compensation.

115. It is not true and no case has held that the Indemnity Fund provides the exclusive

remedy for a taking, nor was it intended to provide constitutionally-mandated just compensation for takings; nothing in the legislative history of the Indemnity Fund provisions of Illinois law suggests such a purpose. See *Hedrick v. Bathon,* 319 Ill. App. 3d 599, 604, 747 N.E.2d 917, 922 (2001), cited in *Malmloff v. County Treasurer*, *supra,* 367 Ill. App. 3d at 764. (Indemnity Fund limited to "certain situations").

116.     In practice the Indemnity Fund is erratic, arbitrary and unpredictable. For example*,* in *Greater Pleasant Valley Church in Christ v. Pappas*, 975 N.E.2d 713, 722 (2012), indemnity sought by a church was ***denied*** in part because the Pastor and Deacons were "'very articulate, bright individuals who have served in the military [and] raised families'".

117.     Defendants routinely oppose Indemnity Fund petitions on grounds of fault, negligence and other grounds irrelevant to entitlement to just compensation under the Constitution(s), further complicating and obstructing rather than facilitating payment of just compensation.

118.     The Indemnity Fund is riddled with other significant problems that prevent it from being an appropriate surrogate or substitute for a just compensation mechanism. For example, no jury is allowed in an Indemnity Fund proceeding, *see* 35 ILCS 200/21-305(b)(1), contrary to Supreme Court precedent requiring jury trials for takings cases.

119.     The Tax Buyers are not necessary parties to this litigation. The Court can provide complete relief among the existing parties. No Tax Buyer has made any claim relating to or asserted any interest relating to this action. Plaintiffs do not seek to obtain or recover possession of or title to property that is or may have been conveyed via tax deed. Failure to join Tax Buyers does not leave any Defendant or other person subject to a risk of incurring double, multiple, or inconsistent obligations.

## PLAINTIFF CLASS ALLEGATIONS

120.  Plaintiffs bring this action individually and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23, including Rule 23(b)(2), 23(b)(3) and 23(c)(1), on behalf of the following Class:

> All persons or entities who meet the following criteria: (1) they owned or were the beneficial owners of real property in the Defendant Counties; (2) the taxes on such property were sold; (3) a tax deed was issued to the purchaser of such taxes and not withdrawn or canceled, and the last market value of such property calculated by the county Assessor before issuance of the tax deed exceeded the Tax Amounts due at the time the tax deed issued.

121.  Excluded from the Class are: (i) any judge or magistrate presiding over this case and their family members; and (ii) Plaintiffs' counsel.

## CLASS ACTION REQUIREMENTS

122.  **Numerosity.** Upon information and belief, hundreds or thousands of persons are members of the Class. Joining them all would be impracticable, but the individuals in question can be identified through Defendants' data. The Tax Amount due for Plaintiffs' and Class members' properties, and any other statutorily imposed fees and costs imposed, may also be established from Defendants' own official records.

123.  **Commonality / Predominance**. Common questions of law and fact exist as to the members of the Class. These questions include, without limitation:

(a)  Whether the transfer of properties to Tax Buyers without promptly remitting to owners, or compensating them for, the equity in their property in excess of the Tax Amounts, constitutes an uncompensated taking of private property for a public purpose, a violation of due process of law, and/or an excessive fine under either or both the United States and Illinois Constitutions;

(b)     Whether Class members whose homes or property is taken without compensation are entitled to reasonable, certain and adequate compensation for their losses, see *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), and how and when such must be provided; and

(c)     Whether the actions complained of result in an excessive fine on affected former property owners.

124.    **Typicality.** The named Plaintiffs' claims are typical of those of the Class. All of the named Plaintiffs' claims arise from the same challenged policies and practices. Plaintiffs are not subject to unique defenses.

125.    **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. All Plaintiffs are members of the Class. Plaintiffs have no interests adverse to the interests of the Class. Plaintiffs are committed to prosecuting this action and have retained competent, experienced counsel who have had substantial success prosecuting complex class action cases and claims based on constitutional law. Indeed, undersigned counsel obtained the unanimous decision of the U.S. Supreme Court in *Tyler*, *supra*, holding deprivations of excess equity as occur here to violate the 5th Amendment.

126.    **Rule 23(b)(3) Predominance/Acting on Grounds that Apply Generally:** Questions of law or fact common to the Class predominate over any questions affecting only individual members of the Class and Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate. Just compensation can be established on a class-wide basis.

127.    **Superiority.** A class action is an appropriate method for the fair and efficient adjudication of this controversy and superior to other methods. Pursuing individual litigation would be unduly burdensome, especially given that many Class members are impoverished and in

no position to hire hourly counsel. Class treatment is also preferable because of the time and expense required for courts to address each individual case and the risks of inconsistent adjudications on the important issues raised herein. Overall, a class action would present far fewer management difficulties than a host of individual lawsuits, as well as the benefits of a single adjudication and comprehensive supervision by a single court.

## "JURIDICAL LINK" and *PAYTON v. KANE COUNTY, ILLINOIS*

128.     All Defendants named herein follow the same practices and act in a uniform manner toward delinquent taxpayers such as Plaintiffs and Class members according to the same Illinois statutes.

129.     Plaintiffs' and the proposed Class members' claims all arise out of a common legal rule that is uniformly followed by all Defendant Counties, Treasurers and Clerks and all have uniformly chosen not to pay just compensation for the Surplus Value in properties they convey to Tax Buyers.

130.     It is reasonable to hold all named Defendant Counties, Treasurers and Clerks accountable within one suit. If the practices alleged herein are unconstitutional for one county, they are unconstitutional for them all.

131.     All Defendants are juridically linked within the meaning of *Payton v. County of Kane*, 308 F.3d 673, 678–80 (7th Cir. 2002). The juridical link among defendants is generally found in instances "where all members of the defendant class are officials of a single state which are charged with enforcing or uniformly acting in accordance with a state statute … which is alleged to be unconstitutional." *Thompson v. Board of Education of the Romeo Community Schools,* 709 F.2d 1200, 1205 (6th Cir. 1983); *Snyder v U.S. Bank N.A.,* 387 F. Supp. 3d 867 (N. D. Ill. 2019).

## CAUSES OF ACTION

132.    All causes of action herein are pleaded in the alternative and are cumulative and in addition to one another.

133.    Plaintiffs seek compensatory monetary relief, *e.g.*, just compensation, and declaratory relief relating to Defendants' failure to provide compensation to persons who lose their equity as alleged herein and whose rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and the Illinois Constitution were violated.

### COUNT I
### TAKING OF PRIVATE PROPERTY WITHOUT JUST COMPENSATION DIRECTLY UNDER U.S. CONST. AM. V AND XIV, UNDER 42 U.S.C. § 1983, AND UNDER ILLINOIS CONSTITUTION

134.    The allegations contained in the preceding paragraphs are incorporated and repeated in this paragraph and this Count is brought individually by Plaintiffs and on behalf of the Class against the Defendants.

135.    The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." The Fourteenth Amendment prohibits state and local governments such as Defendants from violating the right to just compensation. The Fifth Amendment is self-effectuating and provides a ***direct*** cause of action against each Defendant that is in addition to and distinct from any claim under 42 U.S.C. § 1983.

136.    The Illinois Constitution provides at Article I., Section 15: "Private property shall not be taken or damaged for public use without just compensation."

137.    Defendants' policies and practices of failing to adequately, certainly and reasonably compensate Plaintiffs for the equity in properties which Defendants have confiscated or caused homeowners to cease to own and be deprived of is an actionable taking of private property for public use (*i.e.*, the value of their homes in excess of the Tax Amounts due) without just

28

compensation, and a deprivation of Plaintiffs' rights secured under, *inter alia,* the Fifth and Fourteenth Amendments to the United States Constitution and Illinois Constitution.

138. Defendants' violations of rights secured by the Fifth and Fourteenth Amendments and the Illinois Constitution are undertaken as a policy and/or custom and actionable pursuant to, *inter alia,* 42 U.S.C. § 1983, *and* as direct claims brought under those Amendments and/or provisions. Plaintiffs also bring claims directly under the Illinois Constitution.

139. Plaintiffs request issuance of a writ or writs of mandamus directed to the appropriate Defendant(s) if and as necessary for inverse condemnation or other appropriate relief under the Illinois Constitution.

140. As a direct, proximate and foreseeable result of Defendants' unconstitutional failure to compensate Plaintiffs and the Class as alleged, Plaintiffs and Class members whose property value has been taken from them have been injured and damaged and are entitled to, *inter alia,* just compensation and appropriate post-foreclosure and other injunctive relief.

**COUNT II**
**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS**
**U.S. CONST. AM. XIV AND 42 U.S.C. § 1983,**
**AND ILLINOIS CONSTITUTION ARTICLE I., SECTION 2**

141. The allegations contained in the preceding paragraphs hereof are incorporated and repeated in this paragraph and this Count is brought individually by Plaintiffs and on behalf of behalf of the Class against the Defendants.

142. The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving "any person of life, liberty, or property, without due process of law …." U.S. Const. amend. XIV, § 1.

143. The Illinois Constitution provides at Article I., Section 2: "No person shall be deprived of life, liberty or property without due process of law."

144.    Defendants' actions as alleged herein deprive Plaintiffs of substantive and procedural due process and of property and a fundamental property interest without due process of law. This is especially so if, as Defendants maintain, the Indemnity Fund is Plaintiffs' exclusive remedy for loss of equity or Surplus Value or stands as an obstacle to Plaintiffs' recovery.

145.    Plaintiffs and Class members have a protected property interest in the equity in their home and a protected interest in not being deprived of property without compensation or required to pay more in taxes than owed.

146.    Defendants' actions are arbitrary and capricious and unnecessary to the achievement of a legitimate governmental goal, as reflected *inter alia* in the Illinois-Legislative Investigating Commission, Annual Report of 1976: Delinquent Tax Sales: A Report to the Illinois General Assembly, cited above. Defendants have created, implemented and administered procedures in a way that fails to provide Plaintiffs and Class members with reasonable, certain and adequate compensation for taking the entire value of a property over and above any liability for their respective Tax Amounts.

147.    As a direct, proximate and foreseeable result of Defendants' unconstitutional failure to compensate Plaintiffs and the Class as alleged, Plaintiffs and Class members whose property value has been taken from them have been injured and damaged and are entitled to, *inter alia,* just compensation and appropriate post-foreclosure and other injunctive relief.

**COUNT III**
**EXCESSIVE FINES**
**U.S. CONST. AM. VIII, XIV and 42 U.S.C. § 1983**
**and ILLINOIS CONSTITUTION ARTICLE I, Section 11**

148.    The allegations contained in the preceding paragraphs hereof are incorporated and repeated in this paragraph and this Count is brought individually by Plaintiffs and on behalf of the Class, against the Defendants.

149.    The Eighth Amendment to the United States Constitution prohibits the imposition of excessive fines. The Eighth Amendment is applicable to the State of Illinois and its governmental entities within it such as Defendants by operation of the Fourteenth Amendment to the United States Constitution.

150.    The Illinois Constitution provides at Article I., Section 11: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

151.    Taking or depriving the owner of the entire value of a property over and above any liability for Tax Amounts is punitive and an excessive fine under the Eighth Amendment to the United States Constitution and prohibited under the Illinois Constitution. *See Tyler*, 143 S. Ct. at 1381-82 (Gorsuch, J., concurring). Persons guilty of serious crimes are often not penalized as heavily as Plaintiffs have been.

152.    By failing and refusing to compensate Plaintiffs and the Class for their equity in excess of their Tax Amounts owed, Defendants are engaged in assessing and collecting prohibited excessive fines that are not in accord with the seriousness of the offense nor with the objective of restoring the offender to useful citizenship.

153.    As a direct, proximate and foreseeable result of Defendants' unconstitutional actions as alleged, Plaintiffs and Class members have been excessively fined, injured and damaged and are entitled to compensation and appropriate post-foreclosure and other injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Certify this action as a `plaintiff` class action pursuant to Fed. R. Civ. P. 23, with Plaintiffs designated as representatives of the Class for claims against the Defendants and that the

Court appoint undersigned counsel as Lead Class Counsel, including without limitation and as appropriate issue certification under Rule 23(c)(4), Fed. R. Civ. P.;

B.  Award Plaintiffs and the Class just compensation as determined by the Court and/or just compensation, including prejudgment interest, in an amount determined at trial or require or enjoin Defendants to compute and pay just compensation to Plaintiffs and the Class and award Plaintiffs and the Class appropriate relief for the excessive fines and due process violations;

C.  Award Plaintiffs and the Class reasonable attorney's fees and costs, as provided by law;

D.  Declare that the uncompensated seizure, forfeiture and deprivation of equity as alleged herein is unlawful under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and the Illinois Constitution; and

E.  Grant the Plaintiffs and the Class such further relief as may be deemed just and proper to secure and protect their right to just compensation or similar relief or awards.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

Date: March 11, 2024.                By: /s/ *Charles R. Watkins*

Charles R. Watkins (3122790)
GUIN, STOKES & EVANS, LLC
805 Lake Street, #226
Oak Park, Illinois 60301
(312) 878-8391
charlesw@gseattorneys.com

David Guin (*pro hac vice*)
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd N., # 600
Birmingham, Alabama 35203
(205) 503-4505
davidg@gseattorneys.com

Vildan A. Teske
TESKE LAW PLLC
222 South Ninth Street
Suite 1600
Minneapolis, Minnesota 55402
(612) 767-0521
teske@teskelaw.com

Garrett Blanchfield (*pro hac vice*)
Roberta Yard (*pro hac vice*)
REINHARDT WENDORF & BLANCHFIELD
222 S. 9th St., Suite 1600
Minneapolis, MN 55402
(651) 287-2100
g.blanchfield@rwblawfirm.com
r.yard@ rwblawfirm.com

Daniel C. Hedlund (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Abou B. Amara (*pro hac vice*)
Gustafson Gluek PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
(612) 333-8844

*Counsel for Plaintiffs*

## Certificate of Service

The undersigned hereby certifies that on March 11, 2024, I caused this Amended Complaint to be served upon all other parties of record registered with the Clerk of the Northern District of Illinois, by electronically filing a copy of the same via the Northern District of Illinois's CM/ECF filing system, which automatically transmits electronic copies to all parties registered therewith.

_____/s/ Charles R. Watkins_____